. Booth, GMef Justice,
delivered the opinion:
Subdivision 3 of section 145 of the Judicial Code confers jurisdiction upon this court to consider claims of
“ * * * any paymaster, quartermaster, commissary of subsistence, or other disbursing officer, of the United States, or of his administrators or executors, for relief from responsibility on account of loss by capture or otherwise, while in the line of his duty, of Government funds, vouchers, records, or papers in his charge, and for which such officer was and is held responsible.”
Section 147 of the Judicial Code provides the remedy as follows:
“Whenever the Court of Claims ascertains the facts of any loss by any paymaster, quartermaster, commissary of subsistence, or other disbursing officer, in the cases herein-before provided, to have been without fault or negligence on the part of such officer, it shall make a decree setting forth the amount thereof, and upon such decree the proper accounting officers of the Treasury shall allow to such officer the amount so decreed as a credit in the settlement of his accounts.”
The plaintiff was a major in the Quartermaster Corps of the Army. He has been a commissioned officer since June 3, 1912. In September, 1922, he was detailed to duty in charge of the combined commissary and general sales store, Governors Island, New York. General sales stores of the War Department were under the jurisdiction of the Quartermaster General and funds for their establishment and operation were provided for by Congress in the Army supply bills. The War Department formulated and promulgated orders regulating their conduct and governing their operation. Various orders prescribed in general the character and variety of merchandise to be kept on hand and the basis upon which prices were to be charged for the same. Provision was also made in general orders for a system of of accounting, and the officer in charge was held to both accountability and responsibility, i. e., he was charged with the receipt of the merchandise and likewise held responsible upon the basis of money value for its sale and disposition. *384 Sales stores differed from the usual commissary in that a greater variety of merchandise was available for purchase by the officers and enlisted men entitled to the benefits of reduced prices, and permitted the carrying of a much larger quantity of what is designated by the regulations as “ exceptional articles,” i. e., meats, other than issue, fresh fruits, vegetables, etc.
The plaintiff was selected for detail to the Governors Island sales store because of his previous experience and success in managing stores of this character at the Presidio, San Francisco, California, and Camp Dix, New Jersey. A short while after his arrival at Governors Island in September, 1922, he reorganized the sales store at that place and admittedly developed the store into one of consequence and efficiency. Sales of merchandise were most substantially increased and the variety and volume of a railable merchandise materially enlarged. On April 10, 1923, the date when the monthly inventory of March 31, 1923, had been completed and totaled, the plaintiff discovered that a loss of approximately $3,000 had been sustained in the operation of the store for the month of March. The regulations exacted a monthly inventory of stock on hand in order to ascertain the financial status of the store itself, and this inventory was regularly taken on the last day of each month, the store being closed on that day in order that it might be done. The plaintiff personally participated in the taking of inventories and in summing up the result. When the first loss came to his attention uncertainty was engendered as to whether it was due to lack of observance of his established methods or to possible errors in listing and computation of the value of merchandise on hand, and the belief was entertained that the subsequent monthly inventory would or might disclose that no shortage in fact existed. However, the April and May, 1923, inventories disclosed unmistakably that not only was a loss occurring, but had substantially increased in those months to $8,892.20. The plaintiff had been continuously during this period carefully investigating the cause for the loss, and in April and May, 1923, became convinced that it was due wholly or largely to the handling of *385 meats. In fact, his checking of the meat department and his. investigation of the records of the salesman in charge thereof verified his judgment as to the source of loss, and immediately thereafter he displaced this salesman and reported to his superior officer, the corps area quartermaster, the fact of the loss and outlined to this officer a method whereby an increase in the sales price of exceptional articles of merchandise would enable him to recoup the loss without entailing hardship upon the purchasers. The regulations provided that the sales price for exceptional articles should include overhead expense, wastage, deterioration, or other loss, so that the Government sliould lose nothing. The corps area quartermaster approved the plaintiff’s plan; it was put into effect, with the result that during the months of June, July, August, September, and October, 1923, not only no additional losses occurred, but the existing shortage of $8,892.20 was reduced to $4,097.56, almost one-half. The magnitude and details of plaintiff’s daily duties in control and management of the sales store indispensably involved a number of assistants not only of irreproachable character but of experience and settled purpose. In the selection of his assistants the plaintiff was practically without choice. He had selected the manager of the meat department, one Sergeant Edgar P. Taylor, a person in whom he had confidence, and prescribed for his department the keeping by Taylor of books of account showing in detail the exact quantity of meat consigned to the department and the exact quantity disposed of by sale. These accounts during Taylor’s incumbency did not disclose a loss until the plaintiff in checking them back himself discovered discrepancies in debiting the department with meat received, which had the effect of changing a disclosed profit into an actual loss. The remainder of plaintiff’s assistants and clerks, totaling altogether twenty-five, was made up in large part of wholly inexperienced enlisted men detailed from the Army school for bakers and cooks at Fort Hamilton, New York, and he was compelled to operate with such enlisted men and civilian employees having a civil-service status as were from time to time detailed to him by the corps area quartermaster. A changing *386 and inexperienced personnel was, as the proof' shows, á decided handicap placed upon the plaintiff in the handling, cutting, and sale of meats, as well as vegetables and other special articlés. The plaintiff repeatedly protested and sought to correct the situation, all without avail. Attention was called by the plaintiff to his superiors that the handling and sale of meats exacted trained and éxperienced men in that department in order to prevent loss and wastage, but despite his protests inexperienced men from the Army school for bakers and cooks at Fort Hamilton were detailed to him. Plaintiff had reorganized the store and was ambitious to make it a success and thereby serve the purpose of its creation, and there is nothing in the record to warrant a finding that he in any way neglected doing all that could be done to bring this about without a money loss to the Government.
On August 80, 1923, an official investigation was commenced to ascertain the cause of the loss, resulting in a finding that the plaintiff be held responsible for the same, and an order that he make not only reimbursement for the total loss found to exist, but also repay $4,097.56, the amount by which the total loss had been recouped by increases in prices for special articles sold. Subsequently a complete survey was made by a surveying officer appointed by the commanding officer and the report of the surveying officer exonerated the plaintiff, finding that the loss was not due to any fault or negligence upon the part of the plaintiff and recommending that the plaintiff be relieved from responsibility for the loss. The corps area commander declined to approve the above recommendations m toto; he did, however, recommend that the plaintiff be held responsible for only $4,097.56 instead of $8,892.20, i. e., his recommendation was contrary to the first recommendation following the first investigation in that it approved the recoupment of the original loss and gave the plaintiff credit for the amount realized from the increase in price of special articles purposely made to recoup the loss.
On January 27, 1925, the Chief of Finance, the officer to whom the plaintiff was obliged to account, referred the *387 matter to the Quartermaster General, requesting an opinion on certain points. The Quartermaster General reviewed all the papers in the case, gave it consideration, and in reply to the reference stated as his opinion “ That Major White was not negligent to the extent that he should be charged with the amount of the shortage,” and “that the amount of loss should be borne by the congressional appropriations.” Thereafter the Chief of Finance returned the opinion and findings of the Quartermaster General to the commanding general, Second Corps Area, and this officer in reviewing the same found that the plaintiff was “ energetic, conscientious, and enthusiastic in the management of the sales store ”; that regulations for the operation of the store, aside from their indefiniteness and inadequacy, were particularly ineffective to prevent loss and wastage in the handling and sale of special articles; that the limitation of profit upon articles'sold to one-half of one per cent to cover normal wastage was inadequate to recoup the same; that the enlisted personnel detailed to plaintiff was in large part unsuitable for the work to be done, and that while the shortage was in some part to be assigned to errors of judgment upon the part of the plaintiff, it was the officer’s opinion the store could not possibly be conducted under existing regulations without developing a shortage; that surveys and other expedients resorted to in overcoming a possible shortage were through necessity “ fictitious or otherwise irregular.”
On May 23, 1925, the office of the Chief of Finance, Washington, D. C., forwarded to The Adjutant General a communication which we reproduce in part. It is as follows:
“ It is accordingly recommended that Major White be relieved from further responsibility or accountability for the property covered by this report of survey without requiring him to reimburse the Government for the same.”
The Major General of the Army recommended finally that the plaintiff be held responsible for a loss of $4,097.56, and the Secretary of- War on September 4, 1925, approved an order authorizing a checkage of $4,097.56 against the *388 plaintiff’s pay to reimburse the defendant for this amount. From October, 1925, to January, 1929, both months inclusive, there has been deducted at the rate of $50 per month from plaintiff’s pay a total sum of $2,000. The Secretary of War then directed that further deductions be not thereafter made from plaintiff’s pay and the same be suspended pending the decision of this court in the present case.
This suit is for the recovery of the sum of $2,000 deducted as aforesaid, and for a decree releasing the plaintiff from further liability for the losses claimed. In most of the cases heretofore adjudicated by this court under the remedial statutes involved, the subject matter of the loss has been public funds in the custody or under the supervision of officers named in the act. We entertained serious doubt when this case was first submitted as to our jurisdiction in view of the officer’s responsibility and the character of his detail, as well as his accountability for property entrusted to him as manager of and in control of a sales store. The regulations, however, under which accountability and responsibility for Government property are lawfully entrusted to him, render him liable to recoup any losses by the payment of the same in money and place him, we think, within the scope of the statute affording relief to officers of his' rank in the Quartermaster Corps. We have heretofore held that an officer properly and regularly detailed to the duties of quartermaster, commissary, etc., and charged with responsibility may seek relief under the statutes. Hoyle case, 21 C. Cls. 300; Boggs v. United States, 44 C. Cls. 367. The plaintiff was required to dispose of the merchandise in his custody in so far as possible, and account for the receipts thereof to the Finance Department. He did not, it is true, pay for the merchandise purchased for the store* but he was responsible and accountable for the returns received from its sale, and thus in the position of liability for any shortage in his accounts with the Finance Department, which when ascertained would be checked against his pay. The defendant does not challenge the right to establish general sales stores, nor is any contention advanced that the checkage against the plaintiff’s pay as a *389 major could be recovered in any other way than by relief from liability under the acts now invoked by plaintiff. The findings warrant an inference that the establishment of general sale stores was to a very large degree an experiment, and that it eventually proved a decided failure. Stores of this character were established a short time after the termination of the war and permanently discontinued after about five years. In the case of Boggs v. United States, supra, this court reviewed the cases arising under the relief provisions of the acts here involved, and in an exhaustive opinion stated its opinion of the scope and intent of the legislation. The court said (pp. 883, 384) :
“ It is, we think, a sound proposition that the statutes under which the court, on the petition of the plaintiff, has acquired jurisdiction were intended to give disbursing officers a greater right to relief than they already possessed before these acts were passed.
“ They were passed to relieve innocent disbursing officers from the rigors of the law and the consequent judgment of courts of law by allowing them to go into a court of equity, and, by establishing the fact that they were faultless, obtain a ‘ decree ’ which would require the accounting officers to allow to such officer credit in the settlement of his accounts. The provisions in question are predicated upon the act of 1866, which did not lessen the legal liability of disbursing officers, nor give them generally greater legal rights than they possessed. The Court of Claims alone, acting as a court of equity, can administer the equitable provisions under which relief is here asked and award the specific redress authorized by the statute in and only in exceptional cases. That is, where the officer has established the fact that his conduct has really been faultless. Before relief can be granted it must appear with reasonable degree of certainty from all the proof and circumstances of the case that the officer entrusted with public money has exercised watchfulness over the funds and such degree of care as fairly and equitably entitle him to a decree exonerating him from the obligation of his bond.
“ From the foregoing statement it is apparent that the responsibility of the court in this class of cases is very great. It is equally apparent that the court can not well undertake to formulate any general rule declaring what acts may carry exemption from liability. Each case must depend upon those conditions and circumstances which necessarily arise *390 out of the proof when presented. As, however, redress can only be had in exceptional cases there is at the outset a presumption of liability, and the burden of proof must rest upon the officer who has sustained the loss.”
In accounting for a stock of merchandise embracing a wide variety of articles, many of them inherently subject to quick deterioration and wastage, the system invoked should, we think, in order to obtain the relief here sought, measure up to and include the adopted system of the trade, in so far as adopted regulations of the Army will permit. Two factors circumscribed the plaintiff in this respect, factors for which he was not responsible, i. e., a changing and inexperienced personnel of assistants of considerable number upon which he must depend without the right of selection, and a degree of dishonesty, deception, and carelessness available to assistants willing to engage in or practice it. The plaintiff was in possession of a large stock of goods of great value. He did adopt, in so far as he was at liberty to do so, the system of monthly inventories. He did more, by exacting of the assistant in charge of the meat department, where he knew the greater part of the loss would and did occur, a special system of daily accounting. No charge is made that plaintiff personally neglected a single essential duty in so far as his personal presence in the store is concerned, or his personal supervision over it, and it is admitted that he at once detected the apparent danger of loss through inefficient help and protested vigorously and frequently to his superior officer in an effort to correct the situation. His character and honesty, as well as industry and ability, are not attacked. The carelessness attributed to him in defendant’s brief is restricted to allegations that he increased the business of the store to an unwarranted extent, left to subordinates too much accounting responsibility, and failed to observe all the promulgated regulations concerning its management, as well as to report the loss immediately upon its discovery. Plaintiff, the defendant asserts, never did personally complete a monthly inventory of the stock on hand and was too ambitious to build up the store beyond any theretofore existing. The plaintiff was an officer of the Army and as such detailed *391 to take charge of the store. While his detail was predicated upon prior experience and success, it is evident that he was under obligation to take over the store whether he so preferred or not. Plaintiff did not purchase the supplies direct. He had no authority to do so. His superiors knew the amount of merchandise on hand and made no complaint. Authority to expand the volume of merchandise is not disputed. Surely it is not an unusual state of affairs to assign duties and entrust responsibility to subordinates. With sales totaling from thirty to forty thousand dollars a month it was not within range of human activity for plaintiff to do otherwise than he did. When he discovered the derelictions of the manager of the meat department he relieved him from service and procured a reliable man. It is, we think, obvious that the plaintiff could not personally examine and report every single item of merchandise going into the inventories. Assistance was indispensable. Plaintiff personally checked the items in the inventory and he himself ascertained the condition of affairs disclosed therein. In no instance does the proof sustain an allegation that he unduly relied upon subordinates to do work he should have done personally.
On February 1, 1923, the War Department issued its circular No. 7. This regulation, it is said by the defendant, if observed, would have brought official attention to the existence of a shortage months before it was discovered. Possibly this is true, but the record discloses that this regulation was not brought to the attention of the plaintiff until several months after its publication, through no fault of the plaintiff, and when it was, the post commander approved plaintiff’s vouchers made in accord therewith for every month after the date of the circular. It is indisputable that immediately after the plaintiff definitely ascertained the fact of a loss he did report the same to the corps area quartermaster, the officer to whom the same was to be reported. The privilege of increasing prices upon exceptional articles to recoup the loss was approved by plaintiff’s superior to whom he made the proposition. The plaintiff concealed no facts from his superiors and every official in personal contact with the situation, after reviewing with care all the *392 facts and circumstances, completely exonerated plaintiff from any charge of negligence. Was then the plaintiff in fact negligent ? Did he omit to exercise that degree of diligence, care, and supervision essential to protect the Government’s property and funds? It is difficult to perceive wherein the plaintiff failed to adopt all the usual and customary processes employed in merchandising to disclose profit and loss, hampered as he was by regulations which proved in the end to be absolutely impossible of observance' in the successful operation of a sales store. There is nothing of record to sustain a charge that he was either negligent or careless in the discharge of his duties, and we think plaintiff is entitled to the decree provided for in section 147 of' the Code in accord with the findings of fact, and a judgment for the $2,000 heretofore deducted from his pay. It is so-ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge;; and GREEN, Judge, concur.